Filed 11/15/24  P. v. Warda CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>PETER JAMES WARDA,<br><br>Defendant and Appellant. | F084513<br><br>(Super. Ct. No. CR-19-001497)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Robert B. Westbrook, Judge.

Jennifer Mouzis, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kimberley A. Donohue and Craig S. Meyers, Deputy Attorneys General, Attorneys for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Appellant Peter James Warda was leaving a bar with Michelle Gamble when he saw Christopher Woodward leaning against his car, facing Thomas Hinchman. Warda confronted them and Woodward apologized. Warda and Gamble got into the car to leave. As Warda was backing up, he heard one of the men say, "Bitch" and then heard something hit his car. Warda stopped the car and got out. As Warda got out, Woodward and Hinchman approached him. Warda hit Hinchman in the face and the three got into a fight. Warda ended up on the ground, protecting himself with his hands. The two men stopped hitting Warda and Woodward backed away. Warda stood up, pulled out a concealed firearm, and shot and killed Hinchman. Warda got into his car and drove away.

Warda pled guilty to being a felon in possession of a firearm (Pen. Code, § 29800, subd. (a)(1),[1] count II). A jury convicted Warda of voluntary manslaughter (§ 192, subd. (a), in count I) and found the allegation that he personally discharged the firearm in violation of section 12022.5, subdivision (a), to be true. In a bifurcated proceeding, the trial court found the section 12022.1 out-on-bail enhancement true as to each count. Warda was sentenced to an aggregate term of 12 years in state prison.

On appeal, Warda raises the following claims: prosecutorial misconduct for knowingly presenting false testimony at the preliminary hearing to secure a holding order, prosecutorial misconduct at trial based on misstatements of law and evidence, that the trial court erred in giving the mutual combat instruction under CALCRIM No. 3471, that the court deprived him of his right to present a defense by instructing the jury under CALCRIM No. 3472, and that cumulative error resulted in an unjust verdict. The People disagree on each of Warda's claims. We conclude there was no prosecutorial misconduct, that the court's instruction under CALCRIM Nos. 3471 and 3472 were proper, and that there was no cumulative error. We affirm the judgment.

---

[1]     Hereinafter, all undesignated statutory references are to the Penal Code.

2.

## PROCEDURAL BACKGROUND

Warda was charged with murder (§ 187, subd. (a); count I) and being a felon in possession of a firearm (§ 29800, subd. (a)(1); count II). The complaint further alleged that during the commission of the murder, Warda personally and intentionally discharged a firearm within the meaning of section 12022.53, subdivision (d). Additionally, Warda was alleged to have been released on bail when he committed counts I and II, pursuant to section 12022.1.

The preliminary hearing began August 26, 2019. The magistrate found sufficient cause to hold Warda to answer to the charges on August 28, 2019. It did not find premeditation as requested by the prosecution.

On September 11, 2019, the District Attorney of Stanislaus County filed an information in which it alleged that Warda willfully, unlawfully, and feloniously and with malice aforethought, murdered Hinchman (§ 187, subd. (a); count I), alleging that Warda personally and intentionally discharged a firearm which proximately caused great bodily injury or death to Hinchman (§ 12022.53, subd. (d)); and that Warda was a felon in possession of a firearm (§ 29800, subd. (a)(1); count II). It was further alleged as to both counts that Warda was out on bail at the time of the commission of the above offenses (§ 12022.1). Over Warda's objection, a first amended information was filed on March 19, 2021, wherein the People alleged that the murder allegation in count I was premeditated.

Prior to trial, Warda entered a plea of no contest as to count II, a violation of section 29800, subdivision (a)(1). Trial commenced on June 30, 2021. On July 30, 2021, the jury returned a verdict of guilty as to the lesser included offense of voluntary manslaughter (§ 192, subd. (a)) in count I and found the allegation that Warda personally discharged a firearm (§ 12022.5, subd. (a)) true. In a bifurcated proceeding, the court found the out-on-bail enhancements (§ 12022.1) true as to each count.

3.

On June 10, 2022, the court denied Warda's new trial motion. The court sentenced Warda to an aggregate term of 12 years as follows: the middle term of six years for voluntary manslaughter, plus the middle term of four years for the firearm enhancement, plus two years for the on-bail enhancement; the court imposed but stayed a middle term of two years for being a felon in possession of a firearm. The trial court further imposed a separate one-year eight-month sentence in a separate case No. 1465697.

Warda filed a timely appeal on June 13, 2022.

## FACTUAL BACKGROUND

*Prosecution Evidence*

*Michelle Gamble*

On February 17, 2019, Warda picked up Michelle Gamble to go for a ride in his new car. The two ran errands in the new car and ended up at a bar in Modesto. They each had a drink and left after about 15 minutes.

As they exited the bar, Gamble saw two men in their 20s, later identified as Christopher Woodward and Thomas Hinchman, smoking cigarettes and leaning on Warda's car. Warda told the men to get off his car. Gamble began recording a video on her cell phone. Woodward apologized and then Warda and Gamble got into Warda's car. (1RT 70, 88, 96.) The video was played for the jury.

When Warda reversed about halfway out of the parking spot, Gamble heard Hinchman yell, "Bitch" and then heard something hit the car. Warda stopped the car and said, "They threw something at the car." Warda then got out of the car and confronted the two men. Warda stated, "Why are you fucking with my car?" While Warda was by the car door, the two men advanced swiftly towards him. Warda also moved towards Hinchman and then pushed him in the face. Gamble described this as a defensive gesture. Gamble acknowledged this was when the first physical contact was initiated between Warda and the two men. Gamble recorded a video of Warda confronting the two

4.

men which was played for the jury. After watching the video, Gamble recalls Hinchman saying, "You want to touch me?" to Warda right after Warda pushes him on the face.

Warda appeared to retreat backwards as the two men advance on him and move towards the back of the car. Gamble looked over her shoulder and saw Warda on the ground towards the rear of the car. The two men were hitting and kicking Warda, who was on his side, in a fetal position, covering his head with his hands. During the next few minutes, the two men hit and kicked Warda about 20 times each. Gamble did not observe any firearms or weapons during the fight.[2] Gamble turned her attention to a woman who had approached by her car door, and then Gamble heard a gunshot. Gamble did not see the gun being shot. Gamble saw the men had moved towards the front of the car. Warda and Woodward were standing on their feet a couple of feet apart with Hinchman on the ground further away. Warda stood for about a minute then moved very slowly to the car, got into the driver's seat and drove off.

Warda told Gamble that he left his cell phone and key fob at the scene of the shooting.[3] Warda drove to a house where he picked up a cell phone. Then Warda drove to Gamble's home where he called his girlfriend and asked her to bring another key fob for his car. Gamble thought Warda was bleeding from a cut on his head, which Warda asked her to record. Gamble also noticed that Warda's knees and arms were scraped up. Warda said his legs were hurting.

Warda called the Modesto Police Department and asked to speak with a detective at the scene of the shooting. Warda was given a crime stopper number to call instead but Warda did not call the crime stopper number.

---

[2]  Detective Ray Bennett collected a tan folding knife from the parking lot of the shooting. The knife was located next to Hinchman's jacket.

[3]  Detective Ray Bennett collected an iPhone, a Gucci hat and [a car] key fob from the parking lot of the shooting. These items were located together in one spot.

*Christopher Woodward*

Woodward had been friends with Hinchman since high school in 2010.  On February 17, 2019, Woodward met Hinchman at a bar in Modesto.  Woodward and Hinchman spent a couple of hours at the bar with Cheyanne Soria and Katelyn Conley.  Woodward and Hinchman drank several beers and shots of liquor.  Woodward and Hinchman also snorted cocaine at the bar.

At some point, Woodward and Hinchman went outside the bar to smoke cigarettes.  Woodward leaned against Warda's car while Hinchman stood facing Woodward.  Warda exited the bar and was not happy that Woodward was leaning against his car.  Warda was angry and yelled, "Get off my fucking car."  Woodward got up and apologized, and Warda got into his car and started to back up.

As Warda was backing up, Hinchman spit on the ground, which Woodward believed Warda took as an insult.  Woodward testified that neither he nor Hinchman said the word, "bitch," or threw anything at Warda's car.  Warda stopped reversing his car, pulled back into the parking spot and got out and confronted Woodward and Hinchman.  Woodward described Warda as very angry as he approached them, and that he moved a little bit faster than a walking speed.  Woodward believed that he and Hinchman had remained standing where they were, and that it was Warda who had moved towards them.

Warda initiated physical contact and punched Hinchman in the face with his fist.  Woodward did not initially remember if Warda hit him or Hinchman first, but after watching the video, Woodward acknowledged that Warda hit Hinchman first.  Although the video showed that Hinchman had moved towards Warda at the first physical contact, Woodward did not remember it that way.  At that point, Woodward and Hinchman fought back and the three of them got into a fight.  Woodward advanced towards Warda "to help [his] friend out" because he did not want him to get hit again.  Woodward said he hit Warda pretty hard because he was defending his friend, Hinchman.  Woodward did not remember if Warda fought back because everything happened so fast, but he did not think

Warda was able to hit back. The fight lasted about 30 seconds to one minute. During the fight, Woodward did not have anything in his hand and did not use any weapons. The fight had moved from one part of the parking lot to another part. Woodward recalled that Warda was on the ground for one part of the fight.

Woodward testified initially that the fight ended when Warda pulled out a gun and shot Hinchman. He clarified that the fighting ended when he and Hinchman stopped hitting Warda and stepped away from him.[4] Woodward and Hinchman moved a couple of feet away from Warda. Warda then stood up, pulled out a gun and shot Hinchman. Woodward saw Hinchman fall to the ground and watched him "bleed out." Then Woodward saw the car drive away erratically and very fast.

Woodward spoke with the police at the scene of the shooting. Woodward was angry that his friend was shot. Woodward told police that he and Hinchman had "beat[] the dog shit" out of Warda. Woodward said he "felt like a bitch and should have had him." Woodward also told the police, "If you don't find him, I'll kill him in front of you. I will kill him. I don't give a fuck." Woodward acknowledged to the police that he retaliated against Warda.

On cross-examination, Woodward acknowledged that he testified falsely at the preliminary hearing that he had not used cocaine on the night of the shooting, but that it was his recollection at the time. Woodward only just learned that he used cocaine that night after watching the video at trial. Woodward also acknowledged that after watching the video he previously testified incorrectly or falsely that him and Hinchman remained standing on the sidewalk when Warda approached them. And he testified incorrectly that he was the first one to be hit and that he was disoriented by that punch. Woodward also acknowledged that his preliminary hearing testimony that Warda was never on the ground

---

[4]     Alternatively, Woodward testified Warda had broken free from the fight and then Woodward and Hinchman stopped fighting.

was incorrect.  Woodward explained that he was not intentionally trying to deceive anyone.  He explained that when he testified at the preliminary hearing, he testified to what he perceived at the time.  Woodward said this was the most traumatic event in his life, and he was still upset about it and nervous testifying.

After the shooting incident, Woodward went to Warda's place of business.  Warda was not there but Woodward communicated threats of violence to Warda through other people at the business.

Modesto Police Officer Nicholas Largent interviewed Woodward at the scene of the shooting and the jury was shown Largent's body camera footage.  In that video, Woodward stated that he was leaning on Warda's car and Warda started "talking shit." After Woodward apologized, Warda started to drive away.  Then, Hinchman spit on the ground and Warda got out and punched Hinchman in the face.  Woodward claimed they all got into a fist fight and that he and Hinchman "beat the dog shit out of" Warda.  Then, Warda got up and shot Hinchman.  Woodward stated that he thought he was going to jail.

*Charisma Weed*

On February 17, 2019, at around 9:00 p.m., Charisma Weed and her boyfriend pulled into the parking lot of a bar in Modesto.  Weed was sitting in the front passenger seat and noticed three men fighting in the parking lot.  All three appeared mutually engaged in the fight.

Weed did not see how the fight had started.  Weed, who was only 15 feet from the fight, saw the three men pushing each other around.  Weed said they were standing almost in a triangle, using their hands to shove each other's shoulders.  Weed then saw Warda on the ground in a fetal position, covering his head with his hands, as Woodward and Hinchman kept hitting and kicking him.  Warda was not able to fight back while on the ground.  Weed never saw Woodward or Hinchman with any weapons.

8.

After a short time, no more than five minutes, Weed heard a female yell, "That's enough," and the fight ended. Woodward stopped first and walked away towards the female. Hinchman noticed that Woodward had stopped fighting and turned to look for him. Warda stumbled as he got up and took a few steps away from Woodward and Hinchman. Warda used both his arms and legs to get up and was almost crawling and appeared dizzy. When Warda got up, Hinchman turned back to look at him and took two or three steps towards Warda. Warda took a few more steps away from Hinchman and Hinchman then stood where he was, facing Warda. While facing Hinchman, Warda reached into the waistband of his pants and removed a handgun. Warda then pulled the slide back on his handgun, pointed it at Hinchman and shot him. Hinchman's "body jolted," his arms went up and then he fell to the ground. Weed estimated that when Warda shot Hinchman they were 10 feet apart. Warda looked like he was shocked that he just shot Hinchman. Weed's boyfriend then drove them out of the parking lot.

*Jesus Alejandro Diaz*

Jesus Alejandro Diaz worked as a bouncer at the Modesto bar. A few minutes before 9:00 p.m., Diaz was driving into the parking lot to start his shift at the bar when he saw people fighting by the front entrance of the bar. Diaz observed Warda on his knees, covering his face with his forearms to protect himself, as two other men punched and kicked him. Diaz stopped his car and jumped out and yelled, "Hey, you guys, cut it out." The fighting stopped and Woodward and Hinchman took two steps back as they looked at Diaz, who was approaching them.

Diaz then saw Warda stand up with "[n]o hesitation, you know, no stumbling, nothing." Diaz did not see any injuries on any of the three men fighting. Woodward and Hinchman appeared calm and were standing up straight with their arms by their sides and did not try to reach for anything. Warda did not appear to notice Diaz but stared at Hinchman for a few seconds. Warda then reached into his pocket, pulled something out

9.

and then Diaz heard a gunshot. Diaz immediately ducked behind his car. Diaz, who had been around firearms his entire life, thought the gunshot sounded like a small caliber handgun, like a .22.

Diaz saw Warda mumble something and then walk to his car and drive off. Warda acted "nonchalant," walked normally over to his car, and backed up "nice and slow." Warda drove out of the parking lot "just like normal."

Diaz then ran over to Hinchman, who was lying on the ground gasping for air. A female lifted Hinchman's shirt and Diaz saw a gunshot wound. Diaz told the female to apply pressure to the wound and then Diaz ran into the bar and told the bartender to call 911. Diaz went back outside and directed people to perform CPR on Hinchman who had stopped breathing. The police arrived quickly, and Diaz helped keep people away from the crime scene.

*Cheyanne Soria*

Cheyanne Soria considered Hinchman her best friend and was with him, his cousin Katelyn and Woodward at the bar on February 17, 2019. They were all at the bar to celebrate Soria getting a second job. They drank and played some games and hung out for a few hours. When they all left the bar, Soria waited by their car for Katelyn as Woodward and Hinchman smoked cigarettes. Soria heard Warda say something in a loud angry voice about a car, and she walked towards where Woodward and Hinchman were standing. Soria saw Warda and her friends "tussling a little bit," which consisted of pushing and shoving. Then Warda got into his car and started to back up. Soria did not see or hear Woodward or Hinchman throw anything at Warda's car. Warda then stopped his car, exited the car, and started going after Hinchman. Hinchman and Woodward had stayed put and Warda went all the way up to them. Soria described Warda as walking fast towards Hinchman, and believed Warda hit Hinchman, but could not be entirely sure. Then the three of them started wrestling or tussling, which she described as not as serious

10.

as a fight. The fighting consisted of pushing and body punches and "nobody was really aiming for the head or face."

It was Soria's opinion that Warda initiated the second tussle by getting out of his car and going towards Hinchman and Woodward, and then pushing Hinchman first. Soria saw the three men fighting and saw "everyone hitting everyone" and mostly throwing "body punches." Soria did not see anyone kicking anyone. The fighting appeared mutual among all three men, including Warda who was also hitting back. The fighting lasted about five to 10 minutes and then they stopped. Soria did not hear anyone yell anything and said the fight "didn't seem too serious." Warda was on the ground squatting at one point but was able to stand up after they stopped fighting. Warda was not throwing punches at the end when he was on the ground. When Warda stood up, Woodward and Hinchman backed away from him.[5] Warda pulled a firearm out of his pocket, aimed the firearm at Hinchman, pulled the trigger and shot Hinchman. Soria stated that the fighting was done when Hinchman got shot. Neither Hinchman nor Woodward had anything in their hands. Hinchman was approximately 15 to 20 feet away from Warda when Warda shot him. Warda fired the gun one time, Hinchman fell to the ground, then Warda got into his car and drove off. Warda did not appear to be too injured and did not have any trouble walking.

Soria acknowledged that the video of the second tussle showed Hinchman outside Warda's car door where Warda put his hand to Hinchman's face.

*Law Enforcement Evidence*

Modesto Police Officer Nicholas Largent was called to the scene of the shooting on February 17, 2019. He found Hinchman unresponsive with a faint pulse so he began

---

[5]     At the preliminary hearing, Soria testified Hinchman stood there without moving back.

11.

to administer CPR. The ambulance arrived and began removing Hinchman's clothes. Largent noticed that Hinchman's blue shirt and leather jacket had a bullet hole.

On February 20, 2019, three days after the shooting, Modesto Police Sergeant Shane Castro received a phone call from Warda. Warda said he was worried about people trying to kill him and was scared for his life. He told Castro that "[t]hey went to my shop earlier today." Warda told Castro that he was in a physical altercation where he was kicked and punched 20 to 30 times. Warda told Castro that he also got punches in. Warda said that the fight with Woodward and Hinchman lasted about a minute and a half. Warda said he was the victim and that they were trying to kill him. Warda described Hinchman and Woodward as angry, energized and possessed. Warda said he acted out of self-defense and asked Castro whether he would have waited that long before he did something.

Warda then lamented that "I should have fucked him up" and called them pansies. When asked why he did not, Warda responded, "I don't fucking know, man. I don't know. I don't got an answer for you – for that. You know, I usually beat people up." Warda was surprised that he "got stomped out" by two men he did not think would stomp him out. He did not know he would not be able to handle the two men.

Warda asked Sergeant Castro to release information about the shooting to the newspapers. He asked the police to watch the video evidence and it would exonerate him. Warda told Castro that the witnesses were not being honest; that they were changing their stories. Warda mentioned that he was with a woman at the time of the shooting but refused to give Castro any information about Gamble. Warda said that the woman had a video. Castro indicated that based on their investigation, they determined that Warda was the initial aggressor. Castro felt Warda's statements were calculated and that his answers were evasive.

Modesto Police Detective Derrick Letsinger joined the telephone conversation Warda was having with Sergeant Castro. Warda repeatedly mentioned that the police had

12.

a video or that they had watched a video. Letsinger explained to Warda that they did not have any video and he encouraged Warda to give his account of the fight. Letsinger encouraged Warda to get him in contact with his female companion who had the video or to tell her to reach out to them. The video was eventually given to the police. Letsinger also tried to encourage Warda to give them an account of what occurred, but he never got that information. Letsinger described the phone call as more of a "fishing expedition" where Warda was trying to determine what they knew and the course of the police investigation. Warda avoided giving any details about the incident besides a "very vague description of the fight, more describing it as they were killing – trying to kill him or those kind of words. But when it came to specific information, there was none of that."

Detective Letsinger observed photographs of Warda taken within a matter of a few hours after the incident and observed that Warda's injuries were consistent with "a very minor altercation." Warda only had a few light scuffs, one on each knee and on one of his elbows, where the skin was not broken and no blood was present. They appeared like small scabs that had begun to fall off. Letsinger did not observe any black eyes, a bloody nose or split lip or bruising.

The following day, on February 21, 2019, Sergeant Castro went to Warda's residence to execute an arrest and search warrant. The SWAT team made public address announcements for over an hour for Warda to surrender. The SWAT team eventually went into Warda's residence and he was not located inside. Police searched the neighboring house and located Warda hiding in the backseat of a car in the garage.

On February 22, 2019, Modesto Police Detective Joshua Grant transported Warda to the hospital to check for any injuries. A video of Warda being transported to the hospital was played to the jury. Warda was hostile and told Detective Grant and Officer Ra Pouv that his attorney, Frank Carson, was going to humiliate them and give them "a fucking ass whooping."

13.

When they arrived at the hospital, Warda claimed that he had been "jumped" and "beat up" at the scene. Warda claimed he suffered a concussion because he was "asking the same thing over and over." Warda further complained that he hurt his hands, back and spine. Dr. Linda Bobrick examined Warda and said he was "good to go" but ordered CT scans at the request of Detective Grant.

*Warda's Medical Results*

Dr. Robert Barandica, an emergency physician, testified regarding Warda's CT scans taken on February 22, 2019. Warda's CT scan of his brain was normal. The CT scans of his chest, abdomen, pelvis, cervical spine, thoracic spine, and lumbar spine showed no recent injuries. Further, X-rays taken on Warda's elbows and left shoulder were "completely normal." The physical exam revealed no evidence of trauma to Warda, including his head, heart, lungs, back or extremities. After a thorough medical examination, Warda was medically cleared and allowed to be transported back to jail. Dr. Barandica acknowledged that the tests were run five days after the incident but opined that "if there was a significant injury, there would still be evidence of the injury four to five days later." The doctor testified that if a patient had experienced blunt force trauma from kicking, stomping and punching about 20 to 30 times, she would expect to see "scratches, abrasions, bruising, tenderness to palpation, broken bones on X-rays" but none of those were observed on Warda.

*Bill Posey*

Bill Posey, a forensic toxicologist with Central Valley Toxicology testified about how poisons or toxins react within the body and how the body responds. Posey testified that cocaine is a stimulant that affects the central nervous system. It has the effect of making you excited; it also stimulates you or gets you to move or react more quickly. Posey explained that alcohol is a central nervous system depressant and has the opposite action in the body from cocaine. Alcohol slows your thinking and reaction time. It also

lowers your inhibitions and affects the quality or accuracy of your perceptions. Alcohol also affects your memory by slowing down the process of bringing in information, which we tend to lose if not processed quickly. Additionally, alcohol creates difficulty in seeing, hearing and judging distances. Posey tested Hinchman's blood and found a low level of cocaine but a blood-alcohol level of 0.14 percent.

*Hinchman's Autopsy*

Dr. Michael Joseph Ferenc was the forensic pathologist with the Stanislaus Sheriff's Coroner's Division that performed the autopsy on Hinchman. At the time of his death, Hinchman was 22 years old, weighed 170 pounds and was five feet 10 inches tall. Hinchman's cause of death was from a gunshot wound that entered the left side of his chest, perforated his heart and embedded itself in the middle of the spine. There was no finding of gunpowder soot or stippling that would indicate the shooting was at close range. Dr. Ferenc opined it was not a distance shot, but an indeterminate range.

*Defense Evidence*

Katelyn Conley was at the Modesto bar the night of the shooting. Conley was Hinchman's cousin and close friends with Woodward. Conley testified that earlier that day, Hinchman took a Vicodin. Later at the bar, Conley snorted cocaine with Hinchman and Woodward. Conley attended the preliminary hearing in this case. When Conley heard Woodward testify that he had denied using cocaine on the night of the shooting, Conley knew that was untrue and told a police detective.

Earlier in the evening of the shooting, a man started flirting with Cheyanne Soria at the bar. When the man's advances were not welcomed by Soria, he started harassing her. Conley got angry with the man and confronted him. Hinchman also took offense and asked the man to leave them alone. Conley specifically testified that she and Hinchman were irritated, but not angry or mad about the incident. There was no lingering tension after the confrontation and "everything was calm and fine afterwards."

15.

Conley did not remember wearing Hinchman's jacket that evening and did not recall discovering anything inside of the jacket. Detective Pouv testified that Conley told him that she had worn Hinchman's jacket earlier that day and found a switch blade knife in the pocket.

*Verdict and Sentencing*

On July 30, 2021, the jurors returned a verdict of guilty as to the lesser included offense of voluntary manslaughter (§ 192, subd. (a)) in count I, and found the allegation that Warda personally discharged the firearm in violation of section 12022.5, subdivision (a), to be true. In a bifurcated proceeding, the trial court found the section 12022.1, out-on-bail enhancement true as to each count.

On June 10, 2022, the trial court pronounced judgement and a sentence totaling 12 years. As to count I, violation of section 192, subdivision (a), the court imposed the midterm of six years, and the midterm of four years as to the section 12022.5 enhancement. A consecutive term of two years on the section 12022.1, out-on-bail enhancement as to Counts I and II was imposed. As to count II, violation of section 29800, subdivision (a)(1), the court imposed the midterm of two years, to be served concurrently with count I.

## DISCUSSION

I.   NO PROSECUTORIAL MISCONDUCT AT THE PRELIMINARY HEARING.

Warda accuses the prosecution of "knowingly present[ing] the false testimony of Woodward at the preliminary hearing" in order to secure a holding order. Warda states that Woodward's testimony was "central to the court's issuing a holding order on the murder charge" because Woodward's testimony was used to establish Warda was the initial aggressor, i.e., that Woodward and Hinchman were just standing there when Warda hit Woodward in the head, and that Warda fought back and was never on the ground. The People argue the prosecutor did not suborn perjury at the preliminary hearing and that

16.

Warda distorts the record regarding Woodward's testimony. We conclude there is no evidence of prosecutorial misconduct related to Woodward's testimony at the preliminary hearing.

### *A.    Relevant Background*

During the preliminary hearing, Woodward testified regarding the events that led up to the shooting. Woodward testified that Warda exited his car and approached Woodward and Hinchman while they were "just standing there" about 12 feet away. The following colloquy occurred:

> "[Prosecutor]: Okay. And where -- when [Warda] parks the SUV back in that stall, how far away from the SUV are you?
>
> "[Woodward]: Probably from me to you.
>
> "[Prosecutor]: And do you approach [Warda] when he gets out of the SUV?
>
> "[Woodward]: No. We were just standing there. [¶] … [¶]
>
> "[Prosecutor]: When [Warda] got out of the SUV, he approached you –
>
> "[Woodward]: Correct.
>
> "[Prosecutor]: -- and Mr. Hinchman?
>
> "[Woodward]: Yes, sir.
>
> "[Prosecutor]: Did you and Mr. Hinchman move towards [Warda]?
>
> "[Woodward]: No.
>
> "[Prosecutor]: No?
>
> "[Woodward]: No. I don't -- we're -- no."

Woodward said he initiated the conversation by asking Warda, "What's going on?" or "What's up?" Woodward testified that Warda responded physically. When asked about the physical altercation, Woodward responded, "As far as I can recall, I was the first one to be hit by [Warda]. After that, I – it – kind of hard for me to remember all of

it. It happened pretty quick, but I do remember being hit first" in the face which caused him to become disoriented.

When Woodward was asked about details of the fight, he responded, "I don't recall all the way" and "I don't really recall." Woodward answered with "The best I can say is [Hinchman] had [Warda] in a headlock" and that Warda was on his feet hunched over during the fight.

"[Prosecutor]: … At some point during the – the physical fight with [Warda], was [Warda] on the ground?

"[Woodward]: No.

"[Prosecutor]: Was Mr. Hinchman on the ground?

"[Woodward]: Yes.

"[Prosecutor]: And where – when Mr. Hinchman was on the ground, where was [Warda]?

"[Woodward]: [Warda] was fleeing towards his car.

"[Prosecutor]: Was – I'm sorry?

"[Woodward]: [Warda] was going to his car. He was running away.

"[Prosecutor]: Okay. So was this after you heard the gunshot?

"[Woodward]: Correct.

"[Prosecutor]: Okay. Prior to hearing the gunshot, was [Warda] ever on the ground?

"[Woodward]: No.

"[Prosecutor]: Was Mr. Hinchman ever on the ground?

"[Woodward]: No.

"[Prosecutor]: Were you ever on the ground?

"[Woodward]: No.

"[Prosecutor]: So during the fight, everyone remained on their feet?

18.

"[Woodward]: I -- I don't recall."

Woodward did not recall other details such as whether his friends were outside to observe the fight or what he did earlier that day prior to the incident. Witnesses Gamble and Weed testified at the preliminary hearing that Warda ended up hunched over on the ground in the fetal position covering his head and not fighting back.

At trial, Woodward initially testified that after Warda got out of the car he ran up to them and hit Hinchman in the face. But followed up with "I don't remember if [Warda] hit [Hinchman] first or me first. I don't remember." Woodward then described the fight in general terms: "… my memory is Mr. Warda attacking Mr. Hinchman, and Mr. Hinchman fighting back, and me attacking Mr. Warda from behind." When Woodward was asked if Warda was ever on the ground, Woodward testified, "I don't recall."

After being shown a video of the start of the physical confrontation, Woodward agreed that his recollection of the physical fight had been incorrect and that Warda hit Hinchman first. Woodward further agreed that he was incorrect when he previously testified that Warda was never on the ground during the fight. Woodward said he was not intentionally trying to deceive anyone at the preliminary hearing. Woodward explained that when he testified at the preliminary hearing, he testified as to what he "perceived at that time."

Modesto Police Officer Nicholas Largent interviewed Woodward at the scene of the shooting and the jury was shown Largent's body cam footage. In that video, Woodward told Largent that Warda hit his friend in the face and then they got into a fist fight and "we beat the dog shit out of" Warda. Woodward said that Warda fell to the ground, then got up and shot Hinchman.

B.      *Applicable Law*

A prosecutor has "the responsibility and duty to correct what he knows to be false and [to] elicit the truth." (*Napue v. Illinois* (1959) 360 U.S. 264, 269–270.) "The United

19.

States Supreme Court has held that the state's duty to correct false or misleading testimony by prosecution witnesses applies to testimony which the prosecution knows, or *should know*, is false or misleading [citation omitted], and has concluded this obligation applies to testimony whose false or misleading character would be evident in light of information known to other prosecutors, to the police, or to other investigative agencies involved in the criminal prosecution." (*In re Jackson* (1992) 3 Cal.4th 578, 595, disapproved of on other grounds in *In re Sassounian* (1995) 9 Cal.4th 535, 545, fn. 6; see, e.g., *Giglio v. United States* (1972) 405 U.S. 150, 154 [information known to prior prosecutor]; *United States v. Bagley* (1985) 473 U.S. 667, 670–672 & fn. 4 [information known to federal investigators];; see also Comment, The Prosecutor's Duty [to] Disclose: From Brady to Agurs and Beyond (1978) 69 J.Crim.L. & Criminology 197, 205–206; 2 LaFave & Israel, Criminal Procedure (1984) § 19.5, pp. 553–534 & fn. 9.)

"Every person who willfully procures another person to commit perjury is guilty of subornation of perjury, and is punishable in the same manner as he would be if personally guilty of the perjury so procured." (§ 127.) The elements of subornation of perjury are: (1) a corrupt agreement to testify falsely; (2) proof that perjury has in fact been committed; (3) the statements of the witness who committed perjury are material; and (4) such statements were willfully made with knowledge as to the falsity of the statements. (*People v. Jones* (1967) 254 Cal.App.2d 200, 217.)

C.      Analysis

We conclude the record fails to support Warda's claim of prosecutorial misconduct by suborning perjury or knowingly presenting false testimony at the preliminary hearing. The record does not show that Woodward offered false or misleading testimony or that the prosecution knew or should have known the testimony was false or misleading.

At the preliminary hearing, Woodward frequently responded that he did not know or did not recall. When asked who Warda hit first, Woodward prefaced his response by

saying, "As far as I can recall" and added that "It happened pretty quick." And while Woodward initially responded "No" to whether Warda was ever on the ground, he subsequently responded, "I don't recall" when specifically asked, "So during the fight, everyone remained on their feet?" What is clear from the record is that Woodward had a difficult time remembering details of the incident, including whether his friends were outside at the time of the incident.

Woodward testified at trial that he only learned that parts of his recollection were incorrect after watching the videos for the first time during the trial. Woodward specifically acknowledged that his previous statements that Warda hit him first and that Warda was never on the ground were incorrect. Woodward also conceded that the video shows Hinchman walking forward towards Warda before the physical contact occurred, rather than Hinchman standing where he was as he previously testified. As Woodward explained, he did not intentionally lie. Woodward's previous version of events was his best recollection at the time, which were difficult for him to remember. It was only after watching the video in court that he realized his recollection of the events were inconsistent with what was recorded by someone else. Therefore, the record does not show Woodward intentionally provided false testimony.

Moreover, there is no evidence to support Warda's specific claim on appeal that "at trial Woodward candidly admitted that he testified falsely at the preliminary hearing so as to have [Warda] held to answer on the murder charge." This claim is not supported in the record. Woodward never said he testified falsely "so as" to have Warda held to answer on the murder charge. Warda appears to be joining together separate responses from Woodward in order to make this claim: (1) when Woodward acknowledged the parts of his previous testimony were incorrect and (2) when Woodward separately acknowledged that he knew his testimony at the preliminary hearing would determine whether Warda goes to trial for murder. However, Woodward never said he testified falsely in order to secure a holding order.

21.

Second, there is no evidence in the record that (1) the prosecution knowingly offered false evidence at the preliminary hearing, (2) the prosecutor had a prearranged agreement with Woodward to offer false testimony, (3) that perjury had in fact been committed, (4) that the perjury was material, or (5) that the statements were made willfully with knowledge as to their falsity. (See *People v. Jones*, *supra*, 254 Cal.App.2d at p. 217.) For the most part, Woodward's testimony was consistent with Gamble's cell phone video evidence except for some details that he recalled differently. Moreover, the record shows that the prosecutor double checked the parts of Woodward's testimony that differed. The prosecutor checked Woodward's testimony that they remained standing while Warda approached them by asking more specifically if he and Hinchman approached Warda and after Woodward responded, "[N]o," the prosecutor questioned, "[N]o?" to double check. The prosecutor also double checked Woodward about whether Warda was ever on the ground until Woodward admitted that he did not recall. Thus, it shows the prosecutor appeared to notice the discrepancies in Woodward's testimony from other witness's accounts of the events and tried to get Woodward to think about his answer again. As such, there is no evidence the prosecution suborned perjury.

That the trial court chose not to make a finding that there was no prosecutorial misconduct does not mean it believed there was prosecutorial misconduct. Rather, the court made a record that it did not see any prosecutorial misconduct but did not think it appropriate to make that finding in case there were facts the court did not know about. The court stated: "I'm reluctant to make such a blanket finding as I am not aware of all the facts that might support such a finding, and didn't want to make an order without having a sufficient record before me." Part of the court's consideration was that it did not take defense counsel's argument at trial to suggest the prosecutor was suborning perjury. The court did not feel the need to reprimand the defense counsel because the court did not take his "comments as impugning of [the prosecutor's] integrity or that he was aware that

his witness was going to lie or that he suborned perjury." The court stated that the facts offered by Woodward were Woodward's truths.

Regardless, inconsistencies in Woodward's testimony at trial were addressed by the court and jurors were instructed they alone must judge the credibility or believability of the witnesses, the factors to consider in evaluating the truth or accuracy of the witnesses' testimonies (CALCRIM Nos. 105, 200, 226), and how to evaluate conflicting evidence (CALCRIM No. 302). We presume the jury understood and followed these instructions, especially where there is nothing in the record indicating otherwise. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 73, 107.) Woodward's prior inconsistent statements went to the weight of his testimony for the jury to determine his credibility. (See *People v. Maury* (2003) 30 Cal.4th 342, 403, disapproved on other grounds in *Barnett v. Superior Court* (2010) 50 Cal.4th 890, 901 ["it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts …"].; *People v. Lee* (2011) 51 Cal.4th 620, 632 [reviewing courts do not revisit credibility determination on appeal].)

Nor is there evidence the court relied on Woodward's mistaken facts alone to hold Warda to answer at the preliminary hearing. The record is silent on the court's specific basis for holding Warda to answer.

" 'Evidence that will justify a prosecution *need not be sufficient to support a conviction*.' " (*People v. Green* (1979) 95 Cal.App.3d 991, 1005, quoting *Rideout v. Superior Court* (1967) 67 Cal.2d 471, 474.) " ' "Probable cause is shown if a man of ordinary caution or prudence would be led to believe and conscientiously entertain a strong suspicion of the guilt of the accused." ' " (*Rideout*, at p. 474.) "An information will not be set aside or a prosecution thereon prohibited if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it." (*Ibid*.)

23.

Here, Warda raises two challenges: that Woodward's testimony was used to establish that Warda was the initial aggressor and that Warda was never on the ground and did not receive a brutal beating and was unjustified to use deadly force. Although Woodward was wrong that he and Hinchman stood still while Warda approached them for the physical fight, Warda was still the one who initiated the physical contact. Thus, there was evidence that Warda was the initial aggressor. And although Woodward did not recall if Warda was ever on the ground, Gamble and Weed testified that Warda ended up hunched over on the ground in the fetal position covering his head and not fighting back.

A reviewing court may not substitute its judgment as to the weight of the evidence for that of the magistrate, and, if there is some evidence to support the information, the court will not inquire into its sufficiency. (*Rideout v. Superior Court, supra,* 67 Cal.2d at p. 474.) Every legitimate inference that may be drawn from the evidence must be drawn in favor of the information. (*Ibid.*) Here, the evidence offered at the preliminary hearing was sufficient to support that a rational ground existed for assuming the possibility that Warda was the initial aggressor and that his use of deadly force was unreasonable. (See *ibid.*) Therefore, Warda's claim of prosecutorial misconduct regarding Woodward's testimony at the preliminary hearing is denied.

II.     WARDA FAILS TO SHOW PROSECUTORIAL MISCONDUCT AT TRIAL.

Warda claims prosecutorial misconduct prevented him from receiving a fair trial. Warda's specific allegations of misconduct are that the prosecutor misstated the evidence and applicable law during closing argument. Warda claims the errors were prejudicial and the verdict must be reversed. The People disagree and argue the prosecutor did not misstate the evidence or the law during closing arguments. The People note that many of Warda's specific claims are forfeited for failure to object below. They also argue that any alleged error was harmless. Upon review of the record, we do not conclude there was prosecutorial misconduct.

*A. Standard of Review*

A claim of prosecutorial misconduct is governed by the abuse of discretion standard of review. (*People v. Alvarez* (1996) 14 Cal.4th 155, 213.)

*B. Applicable Law*

"[T]o preserve a claim of prosecutorial misconduct for appeal, ' " 'a criminal defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the impropriety.' " [Citation.] The lack of a timely objection and request for admonition will be excused only if either would have been futile or if an admonition would not have cured the harm.' " (*People v. Hoyt* (2020) 8 Cal.5th 892, 942–943.)

The California Supreme Court has repeatedly held that, absent an exception, the failure to object to prosecutorial misconduct forfeits any issue that could have been raised on appeal. (See *People v. Gamache* (2010) 48 Cal.4th 347, 371; *People v. Panah* (2005) 35 Cal.4th 395, 462, 463.) "There are two exceptions to this forfeiture: (1) the objection and/or the request for an admonition would have been futile, or (2) the admonition would have been insufficient to cure the harm occasioned by the misconduct …. A defendant claiming that one of these exceptions applies must find support for his or her claim in the record. [Citation.] The ritual incantation that an exception applies is not enough." (*Panah*, at p. 462.) A defendant claiming that an exception applies must demonstrate support, therefore, in the record. (*Gamache*, at p. 371; *Panah*, at p. 462.)

"To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." (*People v. Frye* (1998) 18 Cal.4th 894, 970, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) "When argument runs counter to instructions given a

jury, we will ordinarily conclude that the jury followed the latter and disregarded the former, for '[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' " (*People v. Osband* (1996) 13 Cal.4th 622, 717; accord, *People v. Katzenberger* (2009) 178 Cal.App.4th 1260, 1268.)

"It is well settled that it is misconduct for a prosecutor to base argument on facts not in evidence." (*People v. Mendoza* (2016) 62 Cal.4th 856, 906.) A prosecutor is given wide latitude during argument. (See *People v. Stanley* (2006) 39 Cal.4th 913, 951–952.) "The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.] It is also clear that counsel during a summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature. [Citations.] The prosecutor is entitled to draw conclusions from the evidence presented and to state them to the jury. The right is very broad and includes the opportunity to fully state [her] views as to what the evidence shows and as to the conclusions to be drawn therefrom. [Citations.] [¶] Moreover, even in a case where prosecutorial misconduct is shown, reversal will not result '… unless the misconduct can be said to have contributed materially to the verdict in a closely balanced case or is of such a nature that it could not have been cured by a proper and timely admonition.' " (*People v. Sassounian* (1986) 182 Cal.App.3d 361, 396–397; see also *People v. Fields* (1983) 35 Cal.3d 329, 363 [Prosecutorial misconduct requires reversal only if it results in prejudice to the defendant].)

C.      *Analysis*

1.      *Misstatements of Evidence During Closing Argument*

Warda contends the prosecutor made a series of misstatements of evidence during her closing arguments to the jury. Those statements are: (1) that Warda did not say

anything as he opened the door to confront Hinchman and Woodward; (2) that there was nothing thrown at Warda's car, which did not show any damage; (3) that Warda engaged in mutual combat; (4) that the fight ended and the parties separated, there was a break, and the fight was done; (5) that a reasonable person would not have started a physical confrontation over someone leaning against his car; (6) that no evidence supported Warda's claim that he was in the fetal position at the end of the fight; (7) that there was no knife used during the fight; (8) that Gamble testified Warda started the fight; (9) that prior to the shooting, neither Hinchman or Woodward threatened Warda; (10) that Warda refused to answer any questions by Detective Letsinger; (11) that Woodward's subsequent conduct of threatening Warda had no bearing on the incident; (12) that it did not matter that Hinchman drank alcohol and ingested cocaine that night; and (13) that Hinchman was trying to retreat as he was shot.

The People argue that Warda forfeited many of these claims on appeal because he failed to object and request an admonition in the trial court. Warda argues that counsel's decision to not object to each and every one of them is in keeping with the commonly held belief among attorneys that "[r]epeated objections might well have served to impress upon the jury the damaging force of the challenged assertions." (*People v. Kirkes* (1952) 39 Cal.2d 719, 726; see also *People v. Hill* (1998) 17 Cal.4th 800, 821.)

The futility exception to the forfeiture rule applies in "unusual" or "extreme" circumstances like those in *People v. Hill, supra,* 17 Cal.4th at pp. 821, 826, where defense counsel's failure to object was excused by the prosecutor's "continual misconduct, coupled with the trial court's failure to rein in her excesses, [which] created a trial atmosphere so poisonous" that further objections "would have been futile and counterproductive" to the defendant. (*Id*. at p. 821.) We address forfeiture and each of the claims of misconduct separately.

### a. *Warda did not say anything as he opened the door to confront Hinchman and Woodward.*

Warda claims that the prosecutor committed misconduct when she asserted during closing argument the following:

"He opens – he puts the car in park. He opens the side door. Goes out around the car. Remember, he's in a spot of safety. He can just leave. And he doesn't say anything at that point. He doesn't yell out the widow, 'Hey, don't throw something at my car' or 'Hey, what was that about?'

"He goes around the door, and he moves towards him because someone who has more height and who's bigger than them is moving toward them."

Warda did not object to this alleged misstatement at trial. There is no evidence that an objection would have been futile since the statement was made towards the beginning of the closing argument; nor is there evidence that any other exception applies. (See *Hill, supra,* 17 Cal.4th at pp. 821, 826.) Thus, this claim is forfeited. (See *Panah, supra*, 35 Cal.4th at p. 462.)

Even if the claim is not forfeited, it is meritless. Gamble testified that it was not until Warda got out of the car to confront the two men that he stated, "Why are you fucking with my car?" The statement appears to be a fair comment on facts in evidence.

### b. *There was nothing thrown at Warda's car, which did not show any damage.*

Warda claims the prosecutor committed misconduct when she asserted during closing argument that neither Hinchman nor Woodward threw anything at Warda's car and there was no evidence of any damage to Warda's car.

Warda did not object to these statements at trial. There is no evidence that the failure to object was excused by the prosecutor's "continual misconduct" since this was also near the beginning of the closing; nor is there evidence that any other exception applies. Thus, this claim is forfeited. (See *Panah, supra*, 35 Cal.4th at p. 462.)

28.

Even if it is not forfeited, it is meritless.  Gamble testified that, as Warda was backing out of the parking spot, she thought she heard Hinchman yell, "Bitch," and she then heard something hit the car.  Gamble was inside the car and did not see Hinchman or Woodward throw anything.  Gamble, testified that Warda stopped the car and said, "They threw something at the car."  Warda then got out of the car and confronted the two men.  Warda said, "Why are you fucking with my car?"  However, Gamble never saw any damage to the car.

Woodward testified that neither he nor Hinchman threw anything at Warda's car.  Soria, who was watching the entire interaction from the parking lot, also did not see or hear anyone throw anything at Warda's car.  Thus, the prosecutor's statement is a fair comment based on facts in evidence.

### c. *Warda engaged in mutual combat.*

Warda claims that the prosecutor committed misconduct when she described the fight as mutual combat during closing as follows:

> "Earlier on when I was discussing the law, it said for mutual combat.  It can be implied or expressed as an invitation.  Well, Mr. Warda extended the invitation.  It was accepted by Mr. Hinchman.
>
> "At this point it was Mr. Warda who got aggressive. At this point it was Mr. Warda who got out of his [car] and left his spot of safety.  At this point it was Mr. Warda who is approaching him.  At this point it was Mr. Warda who escalated this into a physical confrontation.
>
> "And Mr. Warda, he fought back.  You heard from Mr. Warda himself that he got a few punches in, and you also heard it from other witnesses as well.  So this wasn't a one-sided fight.  This is where everyone was involved.  So at this point he doesn't say, 'Hey, you know what, stop, I made a mistake' or put his hands up.  He doesn't say anything.  He starts fighting back.  Invitation has been accepted."

Warda did not object to these statements at trial.  There is no evidence that an objection would have been futile; nor is there evidence that any other exception applies.  Thus, this claim is forfeited.  (See *Panah*, *supra*, 35 Cal.4th at p. 462.)

29.

Regardless, the record contains witness testimony supporting the argument that Warda engaged in mutual combat. Gamble testified that Warda initiated physical contact by pushing or punching Hinchman in the face, which was supported by video evidence. Soria testified that the fight appeared mutual. She "saw everyone hitting everyone," and she specifically saw Warda also hitting back. Weed testified that she saw all three men mutually engaged in the fight, standing almost in a triangle, using their hands to shove each other's shoulders. Warda himself even admitted to police that he landed a few punches during the fight, while lamenting that he did not beat up those two "pansies."

While evidence also showed that at some point in the fight, Warda was unable to fight back and moved into a protective or fetal position, it does not negate the evidence that Warda initially mutually participated in the fight. Thus, the prosecutor's statement is a fair comment based on facts in evidence.

> d.  *The fight ended, the parties separated, there was a break, and the fight was done.*

Warda claims that the prosecutor committed misconduct when she asserted the following during closing: (1) "So the fight ends and the parties separate," and (2) "There was a break. Their fight was done."

Warda objected to the first statement but not the latter. Warda's counsel objected, "It misstates the evidence. The testimony was that the fight ended with the shotgun [*sic*], not before." The trial court reminded the jury that they were the ones to decide the facts of the case and that they could disagree with the prosecutor's characterization of the evidence.

The prosecutor's statement does not amount to misconduct. The witness statements support the prosecutor's comments that the fight ended and the parties separated, and that there was a break and the fight was done. Woodward testified that he and Hinchman stopped fighting Warda, backed away, and then Warda pulled out a firearm and shot Hinchman. Weed testified that Hinchman and Woodward stopped hitting Warda,

Woodward walked away while Hinchman stood there. Warda took about five to 10 seconds to get up and took some steps away then faced Hinchman, reached into his waistband, racked a gun and shot Hinchman. Diaz testified that the fight stopped when he said, "[S]top" or "[C]ut it out." Hinchman and Woodward stopped punching and kicking Warda, took two steps back and looked at Diaz as he was walking towards them. Diaz said Warda stood right up, reached in his pocket, pulled the gun out and shot Hinchman. Soria explained that the fight stopped, the parties separated, Hinchman and Woodward backed away and were just standing there until Warda got up, reached in his pocket, and shot Hinchman. Therefore, the prosecutor's comments are fair comments based on facts in evidence.

> ### e. A reasonable person was obligated to retreat.

Warda challenges the prosecutor's comments that "[u]nder the guise of 'reasonableness,' … [Warda] was obligated to retreat."

The prosecutor stated, "At this point, what does Mr. Warda do? He shoots Mr. Hinchman. He had plenty of other options here. He could have just held the handgun or said I had [*sic*] a gun. He could have left. There's nothing blocking him from leaving. He could have said, 'I'm done. I don't want to fight anymore.' He had all these different options, and this is what he reached for. He went straight for the gun and then straight to the heart."

Defense counsel failed to object below, and the claim is forfeited. (See *Panah*, *supra*, 35 Cal.4th at p. 462.)

Regardless, we disagree that the prosecutor is arguing that Warda was obligated to retreat. Rather, the prosecutor is explaining that the physical fighting had ended and Warda was able to get up and could have gotten in his car and left. Warda argues that Warda had been brutally beaten by Woodward and Hinchman and that Hinchman was still coming for him. However, the evidence shows that Woodward and Hinchman

31.

stopped hitting Warda. The record contains evidence from witnesses supporting the fact that Hinchman and Woodward had stopped fighting and backed away. Plus, there were other people on the scene now who had shown up and called off the fight. Instead of leaving, Warda adjusted his jacket, reached into his waistband or pocket, and drew out a concealed firearm and fired. To argue that a reasonable person would have left when the fighting stopped, is a fair comment based on facts in the evidence.

> f.      *A reasonable person would not have started a physical*
> *confrontation over someone leaning against his car*.

Warda claims that the prosecutor committed misconduct when she asserted the following during closing:

"A reasonable person in a similar situation would not have started a physical confrontation over someone leaning against his [car]. That's not what a reasonable person would do."

Warda did not object to these statements at trial. Finding no exception in the record, the claim is forfeited. (See *Panah*, *supra*, 35 Cal.4th at p. 462.)

Even so, Warda's claim is without merit. When looking at the above statement in its context, we see the prosecutor is applying the concept of reasonableness to the facts of the case. The prosecutor's full statements on reasonableness are as follows:

> "So what is reasonable here? A reasonable person would have checked their car if they thought someone threw something at their car, not immediately start a physical confrontation. A reasonable person would have said something while still in the car or called the police. A reasonable person in a similar situation would have left if they thought someone threw something at their car.
>
> "A reasonable person in the similar situation would have left the scene if they had just been in a fight. Nothing was preventing him at that point. A reasonable person in a similar situation would not have started a physical confrontation over someone leaning against his [car]. That's not what a reasonable person would do."

The prosecution was questioning Warda's defense that he acted reasonably in the situation. The prosecutor was making the point that it was unreasonable for Warda to use deadly force after the fist fight when he could have left. She argued a reasonable person would have called the police and not shot someone after a fight or would have left if they thought someone threw something at their car. She then argued that a reasonable person would not have started a physical confrontation over someone leaning against their car. The prosecutor appears to be making a point about how the fight started in the first place and not intentionally misstating the sequence of facts. The prosecutor was clear in her arguments to the jury that Warda shot Hinchman after the physical fight. Therefore, the prosecutor made a fair comment on the evidence and no error took place.

g. *No evidence supported Warda's claim that he was in the fetal position at the end of the fight*.

Warda claims that the prosecutor committed misconduct when she asserted during her rebuttal argument that no evidence supported Warda's claim that he was in the "fetal position" at the end of the fight. The following colloquy took place:

"[Prosecutor]: And then you heard Mr. Baker [defense counsel] argue that Mr. Warda was in the fetal position. What supports that fact? Nothing.

"[Defense Counsel]: Objects as misstating the evidence.

"[Prosecutor]: Ms. Weed is the –

"[The Court]: Overruled.

"[Prosecutor]: Ms. Weed is the only one who said that. There weren't any injuries consistent with this. I told you to look at all the different physical evidence and also all the witnesses testimony together. Yeah, you're going to get some inconsistencies, and that's one of them."

In this instance, the prosecutor was interrupted by defense counsel before she could finish her argument that only Weed testified that Warda was in a fetal position during the fight. The record shows that Weed did testify that she saw Warda in a fetal position. The record also shows that Woodward, Diaz and Soria did not use the words

33.

"fetal position." They described Warda as on the ground, or his knees, or squatting or hunched over. However, the record also shows that Gamble testified that Warda was on the ground in a fetal position. Therefore, the prosecutor was mistaken when she said only Weed said Warda was in the fetal position. However, this does not affect what the jury already knew to be true: that the witnesses did not agree on whether Warda was in the fetal position.

The prosecutor's point was that Warda did not have injuries consistent with being beaten so badly that he was in the fetal position. The emergency room doctor ran several scans and found no evidence of injury consistent with being beaten. Further, witnesses Soria and Diaz testified the fight was not serious and they did not see any injuries. Therefore, the comment was a fair comment on the state of the evidence and not erroneous.

Warda was not prejudiced by the fact that the prosecutor forgot that Gamble also said Warda was in the fetal position. Right before the prosecutor's statements here, the court had just finished reminding the jury "you are the arbiters of the facts in this case, and if you believe that the People are misstating the evidence that you heard, please remember that it is your job to determine what the facts are. What the attorneys say is not evidence." Here, the jury heard Gamble also testify that Warda was in the fetal position. Therefore, even though the prosecutor forgot about Gamble, the jury understood they were the ones to determine the facts, not the attorneys.

> h. *There was no knife used during the fight.*

Warda challenges the prosecutor's comment that no knife was used in the fight. The prosecutor stated: "Here, no weapons were used by either of the boys. There was no knife. There was no gun." Defense counsel raised an objection to misstating the evidence, which was sustained. The prosecution stated, "There was no knife during the

34.

fight" and defense counsel objected again as misstating the evidence. The court sustained the objection as phrased, and the prosecutor moved on.

Here, the objection was sustained as phrased because there was a knife present during the fight, which was located in Hinchman's jacket. The prosecutor should have rephrased it as "no knife was used during the fight" which would have been accurate. There was no evidence that Hinchman brandished the knife or that Warda even knew about the knife in Hinchman's jacket pocket. Warda concedes in his brief that "there was no evidence that he [Hinchman] displayed it [the knife] during the fight." Even so, the court sustained the objection in front of the jury and the misstatement was caught and corrected. Therefore, there was no error.

### i. Gamble testified that Warda started the fight.

Warda claims the prosecutor misstated the evidence when she argued that Gamble testified that Warda started the fight. The following colloquy occurred:

> "[Prosecutor]: And then we have Warda started the fight. We have that from his companion that night from Ms. Gamble. We have that from Mr. Woodward, and we have that from Ms. Soria.

> "[Defense Counsel]: Object again as misstating the evidence. Ms. Gamble didn't testify to that, that Mr. Warda started the fight.

> "[The Court]: Sustained."

Testimony from Gamble, Woodward and Soria shows that Warda initiated the physical contact, which was also supported by video evidence. Therefore, the prosecutor's comments are fair comments based on facts in evidence.

### j. Prior to the shooting, neither Hinchman or Woodward threatened Warda.

Warda challenges the prosecutor's comment that neither Hinchman nor Woodward threatened Warda. The prosecutor stated, "And then the boys moved back and did not keep fighting Mr. Warda. You heard that from Ms. Weed and Mr. Diaz. ... Both boys did not say anything. They didn't threaten him. They didn't say they were going to kill him."

35.

Defense counsel objected on misstating the evidence because "at least one witness said they were unable to hear." The objection was sustained.

The record contains no evidence that Hinchman or Woodward threatened Warda or made any threatening movements towards Warda after they stopped hitting and kicking him. Diaz testified that after he told them to stop, Woodward and Hinchman appeared calm and were standing up straight with their arms by their sides and did not try to reach for anything. The record does contain testimony from Sergeant Castro that Warda shared that the men were saying "Kill him" while they were stomping him out. Even so, this comment was said during the physical fight and not after they separated. Therefore, we conclude the prosecutor's comments are fair comments based on facts in evidence.

> k.   *Warda refused to answer any questions by Detective Letsinger*.

Warda complained that the prosecutor "falsely asserted that [Warda] 'refused to answer any questions regarding the incident when asked by Detective Letsinger.' " The following sequence occurred:

> "[Prosecutor]: Our job as the People and as the jurors is to determine these stories. [Warda] refused to answer any questions regarding the incident when asked by Detective Letsinger.

> "[Defense Counsel]: Object again. That misstates the evidence. He answered plenty.

> "[The Court]: Sustained.

> "[Prosecutor]: And [Warda] didn't give any information during the call about the incident. He kept asking about what the police had and tried to get them to act on his behalf.

> "[Defense counsel]: Same objection. [¶] …[¶]

> "[The Court]: Sustained."

The record contains Letsinger's account that Warda "avoided giving any details about the incident outside of a very vague description of the fight, more describing it as they were killing – trying to kill him or those kind of words. But when it came to specific

36.

information, there was none of that." While Warda did answer law enforcement, his statements were calculated and he was evasive in his answers. Therefore, the prosecutor's statement was a fair comment based on the facts in evidence. Regardless, the court sustained the objection in front of the jury and the misstatement was caught and corrected. Therefore, there was no error.

> *l.*      *Woodward's subsequent conduct of threatening Warda had no bearing on the incident.*

Warda contends that the prosecutor misstated the evidence when she argued that Woodward's subsequent conduct of threatening Warda a few days after the shooting did not matter regarding what happened at the bar. The following argument and objection took place:

> "[Prosecutor]: … Whether the physical contact was a slap or a punch, in either case, Mr. Warda is the initial aggressor. He initiated physical contact so hard Mr. Hinchman flew back. Woodward's subsequent conduct has nothing to so with what happened at the [bar] –

> "[Defense Counsel]: Objection; []relevant and admissible under Evidence Code 1103. It is relevant by law.

> "[The Court]: Up on the screen it says what does not matter. You're using the word relevant. I think there are two different meanings there. Ms. – I'll sustain the objection as to it not being relevant, because you're going to be instructed as to that point."

The prosecutor was arguing that Woodward's subsequent conduct did not alter the fact that Warda initiated the physical fight. Even so, after the objection, the court explained to the jury that they would be getting instructions on the relevance of Woodward's subsequent conduct. Therefore, there was no confusion to the jury and no error.

    *m. It did not matter that Hinchman drank alcohol and ingested cocaine that night.*

  Warda also complains that the prosecutor misstated the evidence when it argued it did not matter than Hinchman drank alcohol and ingested cocaine that night.  The following argument and objection took place:

  "[Prosecution]:  … [It doesn't matter] [h]ow much Hinchman drank or the cocaine -

  "[Defense Counsel]: Same objection … [t]hat it was admitted because it was relevant.

  "[The Court]: Sustained.

  "[Prosecution]: Your Honor, my argument is it doesn't matter about why that fact overall, and this is a part of what I'm arguing in my closing.

  "[The Court]: I think the objection was he said it wasn't relevant.

  "[Prosecution]: Right or does not matter.

  "[The Court]: You may proceed.

  "[Prosecution]: Thank you. It doesn't matter, because Mr. Warda was the one who initiated that physical contact.  Even if they were sober, Mr. Warda still initiated here.  When the fight stopped in either case, the fight was done, so the fight really doesn't matter.  What matters is what Mr. Warda was in that moment what he knew at that moment he decided to take Mr. Hinchman's life.

  "[Defense Counsel]: I'll object again.  It also misstates the evidence or the People's evidence was that the fight was over when the shot was fired.

  "[The Court]: Overruled."

  The prosecutor argued specifically that Warda initiated the physical fight and the fact that Hinchman was drunk and possibly high did not change that fact.  Also, as discussed above, evidence in the record supports the argument that the fighting was over when the shot was fired.  Therefore, the prosecutor's statement was a fair comment based on facts in evidence.

38.

> n. *Hinchman was in a position to retreat when he was shot.*

Warda contends that the prosecution misstated the evidence when she argued that Hinchman was trying to retreat as he was shot. The prosecutor stated, "The fight ended. You heard that from two witnesses who have no dog in this fight whatsoever. They have no interest here. He was fine. He escalated the situation and brought a gun to the fist fight, and he used that gun to kill Hinchman when he was in a position to retreat."

Defense counsel objected stating, "There's no evidence that Mr. Hinchman was [*sic*] retreating."

We agree with the People that Warda has misread the argument. The prosecutor is not claiming that Hinchman was in a position to retreat, but rather that Warda was in a position to retreat. The use of "he" above consistently referred to Warda: "He escalated the situation", he "brought a gun" and "he used that gun to kill Hinchman" when "he" "was in a position to retreat." As discussed above, when the physical fighting ended, Warda could have gotten into his car and left. Therefore, there was no misstatement of facts and the prosecutor's statement was a fair comment based on facts in evidence.

> 2. *Inflammatory Remarks*

Warda contends the prosecutor made inflammatory remarks to support her theory of contrived self-defense. The following are Warda's allegations of inflammatory remarks:

The prosecutor commenced her argument as follows: " 'Fucking blow my head off, I think. I'm not saying it's the wrong thing. And I think it's the right thing to do, not saying it's wrong.' Those are the words [Warda] spoke to Detective Grant in the hospital while waiting medical clearance." Defense counsel did not object.

The prosecutor argued: "You heard him say in the hospital that shooting them was the right thing to do. He's not saying it's wrong, that they were about to get into a fight. That indicates that the fight – that he was thinking about shooting them, even before the

39.

fight [has] even started.  He went into this physical confrontation expecting to use deadly force."  Defense counsel did not object.

The prosecutor later argued:

"He also told Detective Grant after the shooting it was the right thing to do, and then Mr. Warda fled.  He didn't stick around.  You heard that jury instruction about his flight.  We're going to get to that in a minute.  Plus he gave us his own words.  He believed that because he was in a fist fight, that gave him permission to use deadly force here.  It's not how the law works.  At the point where Mr. Hinchman was shot, there is no threat upon him.  He had plenty of options to back out here.  He did not have to take another person's life.

"This is what he said to Detective Grant in the hospital, 'Hey, if me and my family wanted to beat your ass, you wouldn't shoot us?  We're about to jump you and fuck you up.  You wouldn't shoot me?  Really, you wouldn't?  You would, bro.  Fucking blow my head off.  Me and my friend were jumping you, about to beat your ass, fucking blow my head off, I think, and I think it's the right thing to do.  I'm not saying it's wrong.'

"That indicates that Mr. Warda went into that physical confrontation intending to kill Mr. Hinchman.  He keeps saying he's going to blow his head off.  He's about to enter a fight.  He's speculating at this point because he thinks, oh, because this is a fist fight, I have the right to use deadly force.  It's not how the law works, and there's no indication in the physical evidence or any of the evidence presented that this was a threat upon Mr. Warda, and that this was a fight for his life."

Again, defense counsel did not object.

Warda did not object to these statements at trial.  There is no evidence that the failure to object was futile or excused by the prosecutor's "continual misconduct"; nor is there evidence that any other exception applies.  Thus, this claim is forfeited.  (See *Panah*, *supra*, 35 Cal.4th at p. 462.)

Additionally, the prosecution's comments relaying Warda's statements to Detective Grant are verbatim quotes of what Warda said in the hospital.  Verbatim quotes cannot be said to be misstatements of evidence.  Thus, the prosecution's statements were fair comments based on facts in evidence and not grounds for prosecutorial misconduct.

40.

### 3.    Misstatements of Law

Warda claims the prosecutor made the following misstatements of law: (1) that Warda had a duty to retreat in contrast to CALCRIM No. 505; and (2) that the law required Warda to have no other choice but to shoot.

On review of the record, the prosecutor did not state that Warda had a duty to retreat. Rather, the prosecutor made the argument that when the fighting stopped Warda could have left the scene, that nothing was blocking him. That is not the same as arguing that Warda had a duty to retreat. Warda is alleging the prosecutor made arguments that it did not make. As such, the prosecutor did not misstate the law here. Even so, the trial court told the jury to follow the instructions it had given and clarified that there was "no duty to retreat."

Warda also fails to disclose what jury instruction or law was violated by the prosecution's argument that Warda had other choices available rather than to shoot. Arguments raised in a conclusory manner, without adequate analysis, are treated as forfeited. (See *People v. Harper* (2000) 82 Cal.App.4th 1413, 1419, fn. 4.)

### 4.    Harmless Error

Even assuming one or more of the above allegations of prosecutorial misconduct was found, Warda fails to demonstrate he was prejudiced.

Any potential error was minimized by the trial court's instruction to the jury. The trial court instructed the jury pursuant to CALCRIM No. 222 that: "Nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence. Their questions are not evidence. Only the witnesses' answers are evidence …. Do not assume that something is true just because one of the attorneys asked a question that suggested it was true." (CALCRIM No. 222.)

The trial court also instructed the jury: "You must decide what the facts are. It is up to you. It is up to all of you, and you alone, to decide what happened based on the

41.

evidence that has been presented to you in this trial." (CALCRIM No. 104.) The trial court informed the jury several times that the jury is the decider of facts. Specifically, the trial court told the jurors that, "If you think that the prosecution is misstating the evidence, it is you who gets to decide what the facts are." The trial court also told the jury to refer to the written jury instructions when defense counsel objected that the prosecution misstated the law.

The jury is presumed to have understood and followed these instructions. (See *People v. Brady* (2010) 50 Cal.4th 547, 566, fn. 9.) We " 'do not lightly infer' " that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. (See *People v. Frye, supra,* 18 Cal.4th at p. 970.) Since the jury was properly instructed, it would have corrected any potential misstatements of law or evidence. As such, Warda fails to show "a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner." (See *ibid*.)

III.    THE TRIAL COURT DID NOT ERR BY INSTRUCTING THE JURY UNDER CALCRIM NO. 3471.

Warda contends the trial court erred in instructing the jury pursuant to CALCRIM No. 3471, which applies only where the defendant engaged in mutual combat or initiated the fight. Warda contends the evidence adduced at trial "does not support a finding that [he] was the initial aggressor, or that he engaged in mutual combat, thus the giving of CALCRIM No. 3471 was prejudicial, leading to confusion and an unjust verdict …." Warda also contends the giving of the jury instruction violated his rights to due process and a fair trial under the federal constitution. The People disagree and argue there was no error. After the court ruled in favor of the defense to instruct on justifiable self-defense under CALCRIM No. 505, the court correctly instructed the jury on applicable limitations where the defendant is the initial aggressor or engaged in mutual combat. We agree with the People.

*A.     Relevant Procedural History*

At the conclusion of the evidence, the parties discussed the jury instructions outside the presence of the jury.  Warda's counsel objected to "any and all of the language referring to mutual combat" as "inappropriate and misleading."  The prosecution requested the instruction on mutual combat based on witnesses who saw Warda fighting back.  The court concluded that although "[t]he fight may not have gone Mr. Warda's way, he did get out of the car, approached the other gentlemen and struck the first blow… I think that's, again, a question for the jury to decide whether this was mutual combat or who started the fight.  So I have a sua sponte duty to instruct the defense if there's substantial evidence supporting it, I think. … There might be substantial evidence here just based on the video."

The jury was instructed as follows:

> "A person who engages in mutual combat or who starts a fight has a right to self-defense only if, one, he actually and in good faith tries to stop fighting; two, indicates by word or conduct to his opponent in a way that a reasonable person would understand that he wants to stop fighting and has stopped fighting.  And three, he gives his opponent a chance to stop fighting.

> "If the defendant meets these requirements, he then had a right to self-defense if the opponent had continued to fight.  However, if the defendant used only nondeadly force, and the opponent started with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting, communicate the desire to stop to the opponent or give the opponent a chance to stop fighting.

> "A fight is mutual combat when it began or continued by mutual consent or agreement.  That agreement may be expressly stated or implied and must occur before the claim that self-defense arose."

*B.     Applicable Law*

" 'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the

43.

evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' " (*People v. Diaz* (2015) 60 Cal.4th 1176, 1189; accord, *People v. Breverman* (1998) 19 Cal.4th 142, 154, disapproved of on other grounds in *People v. Schuller* (2023) 15 Cal.5th 237, 255-260.) "The trial court must give instructions on every theory of the case supported by substantial evidence, including defenses that are not inconsistent with the defendant's theory of the case." (*People v. Young* (2005) 34 Cal.4th 1149, 1200 (*Young*).)

" ' "Substantial evidence is evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive." ' " (*People v. Cole* (2004) 33 Cal.4th 1158, 1215; *People v. Crew* (2003) 31 Cal.4th 822, 835 ["Substantial evidence is evidence of reasonable, credible value"].)

"A party is entitled to a requested instruction if it is supported by substantial evidence." (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1049 (*Ross*).) The instruction on mutual combat does not set out a defense or a defense theory but instead states a longstanding legal principle limiting the claim of self-defense. (See e.g., *People v. Button* (1895) 106 Cal. 628, 631 [Section 197 "is simply declarative of the common law … since the days of Lord Hale"].) Section 197 sets out the principle that justifiable homicide based on self-defense is not available to the defendant who engages in mutual combat or started the fight. Section 197 states that homicide is justifiable to, inter alia, defend against danger, but if the person who commits homicide "was the assailant or engaged in mutual combat, [he or she] must really and in good faith have endeavored to decline any further struggle before the homicide was committed." (§ 197.)

Instruction on mutual combat, whether as a theory or general principle of law, must be given where it is supported by substantial evidence. (*People v. Diaz*, *supra*, 60 Cal.4th at p. 1189; accord, *Ross*, *supra*, 155 Cal.App.4th at pp. 1046–1047.) Whether there is substantial evidence the defendant was the initial aggressor or engaged in mutual

44.

combat is "the dispositive consideration" for deciding to give the instruction. (*Ross*, at p. 1052.)

C.    *Standard of Review*

Instructional error is subject to de novo review. (*People v. Berryman* (1993) 6 Cal.4th 1048, 1089, overruled on another point by *People v. Hill*, *supra*, 17 Cal.4th 800, 823, fn. 1, see *People v. Posey* (2004) 32 Cal.4th 193, 218 [instructional error subject to de novo review].) Whether the trial court should have given a "particular instruction in any particular case entails the resolution of a mixed question of law and fact," which is "predominantly legal" and examined without deference to the trial court's reasoning. (*People v. Waidla* (2000) 22 Cal.4th 690, 733.)

D.    *Analysis*

Upon review of the record, we conclude there is substantial evidence that Warda was the initial aggressor and that he engaged in mutual combat. Therefore, the court did not err in instructing the jury on CALCRIM No. 3471.

1.    *Initial aggressor*

We disagree that there was no evidence that Warda was the initial aggressor. Video evidence shows Warda exit his car in order to approach Hinchman who was just outside the car approaching him on foot. The video shows Warda extending one hand to either push or punch Hinchman in the face. Woodward testified that Warda threw the first punch using his fist. Gamble admitted that Warda "did push them back first" by placing one hand on Hinchman's face. Gamble admitted that this was the point where physical contact was initiated. Thus, there is substantial evidence that Warda initiated the physical fight. (See *Crew*, *supra*, 31 Cal.4th at p. 835.)

We recognize the trial court made a comment at the sentencing hearing that the video "showed [Warda was] not the initial aggressor." The court made this comment postconviction at sentencing as a mitigating factor. However, the court was clear at the

45.

hearing for jury instructions that it felt there was substantial evidence that Warda was the initiator to warrant the sua sponte instruction on mutual combat. In fact, even at the close of the prosecutor's case, the court stated: "I think there's sufficient evidence for all these questions to be put to the jury. I think the People met their burden." Gamble, Woodward and Soria testified that Warda initiated the physical contact. The record contains substantial evidence that Warda was the initial aggressor. Therefore, it was not error for the court to instruct the jury on CALCRIM No. 3471. (See *People v. Diaz*, *supra*, 60 Cal.4th at p. 1189; accord, *Ross*, *supra*, 155 Cal.App.4th at pp. 1046–1047, 1052.)

> 2. *Mutual combat*

The record also contains substantial evidence that Warda engaged in mutual combat with the preexisting intent to engage. As discussed above, there was evidence that Warda was the initiator of physical contact in the fight, which demonstrates a preexisting intention to engage. (See *Ross*, *supra*, 155 Cal.App.4th at p. 1045.) The evidence also shows Warda subsequently participated in a reciprocal exchange of blows. Soria testified she saw all three hitting each other and saw Warda throwing physical punches. Sergeant Castro testified that Warda admitted to him that the fight with Hinchman and Woodward was mutual and lasted about 90 seconds. Warda admitted he landed several punches and expressed frustration that he was unable to beat up the two "pansies" and "should have fucked him up." Therefore, there was substantial evidence to support the instruction on mutual combat. (See *Ross*, at pp. 1033, 1046–1047.)

Warda's reliance on *Ross* to argue the prosecution's requests for mutual combat is a tactical maneuver to counter his claim that the victim was the initial aggressor is readily distinguishable here. (See *Ross*, *supra*, 155 Cal.App.4th at p. 1047.) In *Ross*, the Court of Appeal reversed a conviction for assault and battery due to prejudice from the confluence of two instructional errors on mutual combat. (*Ibid*.) The conviction was based on facts where a victim had slapped the defendant during an argument, and the defendant responded by striking the victim and fracturing her cheekbone. (*Id*. at

46.

p. 1036.)  The appellate court found it was error for the trial court to have given an instruction on mutual combat under CALJIC No. 5.56 due to a lack of substantial evidence of mutual combat.  The court found, "no reasonable juror could conclude beyond a reasonable doubt that defendant and [the victim] were engaged in 'mutual combat' when he punched her." (*Ross*, at p. 1050.)  Indeed, the trial court—at the first and second trials—concluded there was no evidence of mutual combat.  (*Ibid*.)  Despite finding a lack of evidence of mutual combat, the trial court gave the instruction based on "the prosecutor's insistence that he required [the mutual combat instruction] for *tactical reasons*, i.e., to meet the defense theory concerning the lesser offenses of simple assault and battery," and the instruction was given solely " 'because of the lessers.' " (*Id*. at p. 1051.)  The appellate court found that this was error:  "A party's wish to have the jury instructed on a certain point cannot be honored based only upon the party's desire to make rhetorical or tactical use of the instruction." (*Ibid*.)  Instead, "the dispositive consideration is whether the instruction is supported by substantial *evidence*.  Here, the mutual defense instruction was not." (*Id*. at p. 1052.)

The second instructional error in *Ross* also involved mutual combat.  The jury was not given the legal definition or requirements for mutual combat but was erroneously told that it "involved no particular legal requirement, but should be understood and applied in an ordinary, lay sense." (*Ross*, *supra*, 155 Cal.App.4th at pp. 1042, fn. 9, 1047.)  The two errors resulted in "an unwarranted and dangerously incomplete instruction on a *prosecution* theory in *rebuttal* of the defense." (*Id*. at p. 1054.)  The instructional errors left the jury to think the instruction applied to any exchange of blows and the court failed to clarify the meaning of mutual combat even after requests from the jury.  These facts suggested the jury misapplied the instruction and improperly disqualified the defendant from asserting a right to self-defense, resulting in prejudice.  (*Id.* at p. 1056.)

*Ross* is readily distinguished from this case.  Unlike in *Ross*, here, there was substantial evidence to support the evidentiary threshold for instructing on mutual combat

47.

under CALCRIM No. 3471. Further, here, the jury was properly instructed on the definition of mutual combat, explaining that it exists "when it began or continued by mutual consent or agreement" which may be expressly stated or implied and must occur before the claim to self-defense arose. Therefore, the instruction under CALCRIM No. 3471 was proper.

### 3. Any error is harmless

Even assuming there was insufficient evidence to support the jury instruction on mutual combat, any potential error in giving the instruction was harmless. An instruction that is correct in law but has no application to the case is an error "of state law subject to the traditional *Watson*[6] test .…" (*People v. Guiton* (1993) 4 Cal.4th 1116, 1130 (*Guiton*).) The *Watson* standard requires Warda to show a reasonable probability of a more favorable result had the instruction not been given. (*Guiton,* at pp. 1129–1130; see *Ross*, *supra*, 155 Cal.App.4th at pp. 1054–1055.) It "focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration." (*People v. Breverman, supra,* 19 Cal.4th at p. 177; accord, *People v. Valenzuela* (2011) 199 Cal.App.4th 1214, 1234.) Only if, after an examination of the entire record, a court concludes that an instructional error has resulted in a miscarriage of justice can the judgment be set aside. (Cal. Const., art. VI, § 13; *People v. Dieguez* (2001) 89 Cal.App.4th 266, 278.)

The review for instructional error considers "the instructions as a whole, the jury's findings, and the closing arguments of counsel." (*People v. Larsen* (2012) 205 Cal.App.4th 810, 831; *People v. Cain* (1995) 10 Cal.4th 1, 35–36, overruled on other grounds in *People v. Moon* (2005) 37 Cal.4th 1, 17.) CALCRIM No. 3471 is not a directive. It is a conditional instruction, applicable only if the jury finds that the defendant was the initial aggressor or engaged in mutual combat.

---

**6** *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*).

A jury instruction that lacks evidence to support it can be held harmless "because juries are said to ignore irrelevant instructions." (*Ross*, *supra*, 155 Cal.App.4th at pp. 1055–1056.) The trial court instructed the jury with CALCRIM No. 200, which provides as follows: "Some of these instructions may not apply depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them."

Reviewing courts presume the jury followed the trial court's instructions. (See *People v. Williams* (2015) 61 Cal.4th 1244, 280; *People v. Holloway* (2004) 33 Cal.4th 96, 152–153; *People v. Yeoman* (2003) 31 Cal.4th 93, 139; [it is presumed the jury understood and followed the court's instruction in the absence of any showing to the contrary]; *Guiton, supra,* 4 Cal.4th at p. 1131.) There is nothing that suggests the jury strayed from the instructions as a whole or improperly disqualified Warda from claiming self-defense. Thus, if the jury determined the parties did not have a preexisting agreement (express of implied) to fight as defined in CALCRIM No. 3471, the jury is presumed to have understood and followed the instructions it was given and disregarded CALCRIM No. 3471. (See *People v. Sandoval* (2015) 62 Cal.4th 394, 422.)

IV.     THE TRIAL COURT DID NOT ERR BY INSTRUCTING THE JURY UNDER CALCRIM NO. 3472.

Warda contends that the trial court erroneously "instructed the jury [under CALCRIM No. 3472] that the right to self-defense cannot be contrived; i.e., that a person does not have the right to self-defense if he provokes a fight or quarrel with the intent to use force." Warda contends "there was no substantial evidence to support this instruction, because it was beyond dispute that the provocateurs were Hinchman and Woodward." Warda argues he did not create an excuse to use force. He argues his act of pushing or punching Hinchman was not a wrongful act applicable to the contrived self-defense theory. Warda argues it was prejudicial error to give this instruction because the

49.

prosecutor relied on the erroneous instruction in closing arguments. The People contend Warda forfeited this claim by failing to object below. They also argue that the instruction was properly given. We conclude substantial evidence supports the instruction.

### A.      Relevant Factual Background

Warda acknowledges that he did not object when the trial court informed the parties it would be instructing the jury with CALCRIM No. 3472.

The court instructed the jury under CALCRIM No. 3472 as follows: "A person does not have a right to self-defense is he or she provokes a fight or quarrel with the intent to create an excuse to use force."

### B.      Applicable Law

"The trial court must give instructions on every theory of the case supported by substantial evidence, including defenses that are not inconsistent with the defendant's theory of the case." (*Young, supra,* 34 Cal.4th at p. 1200.) " ' "Substantial evidence is evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive." ' " (*People v. Cole, supra,* 33 Cal.4th at p. 1215; *Crew, supra,* 31 Cal.4th at p. 835 ["Substantial evidence is evidence of reasonable, credible value"].)

A party forfeits any challenge to a jury instruction that was correct in law and responsive to the evidence if the party failed to object in the trial court. (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011–1012; see *People v. Nguyen* (2015) 61 Cal.4th 1015, 1051 ["If defendant believed the instruction was incomplete or misleading, he 'had the obligation to request clarifying language' "].) This rule does not apply if the instruction was an incorrect statement of law (*Hudson*, at p. 1012), nor does it apply if the instructional error affected appellant's substantial rights (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087). (See § 1259; *People v. Andersen* (1994) 26 Cal.App.4th

1241, 1249 ["i.e., resulted in a miscarriage of justice, making it reasonably probable the defendant would have obtained a more favorable result in the absence of error"].)

"CALCRIM No. 3472 is generally a correct statement of law, which might require modification in the rare case in which a defendant intended to provoke only a nondeadly confrontation and the victim responds with deadly force." (*People v. Eulian* (2016) 247 Cal.App.4th 1324, 1334; see *People v. Enraca* (2012) 53 Cal.4th 735, 761 [a claim of imperfect self-defense cannot be invoked by a defendant who created the circumstances through his own wrongful conduct].)  As an example, "a defendant who assaults his victims with a gun may not set up a valid self-defense claim with evidence he believed the victims also reached for a gun, since they would be justified in meeting deadly force with deadly force." (*People v. Ramirez* (2015) 233 Cal.App.4th 940, 948 (*Ramirez*).)  Where there is evidence that a defendant intended to provoke only a nondeadly confrontation and the victim responded with deadly force, then the court must instruct the jury that:  " 'if the defendant used only nondeadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend [himself/herself] with deadly force and was not required to try to stop fighting .…' " (*Id*. at p. 952.)

"It is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case." (*Guiton, supra,* 4 Cal.4th at p. 1129; accord, *People v. Eggers* (1947) 30 Cal.2d 676, 687.)  An instruction that is correct in law but has no application to the case is an error "of state law subject to the traditional *Watson* test ...." (*Guiton*, at p. 1130; see *Watson, supra,* 46 Cal.2d at p. 836.)

C.    Analysis

Our Supreme Court, in *People v. Enraca*, held that a claim of imperfect self-defense cannot be invoked by a defendant who created the circumstances through his own wrongful conduct.  (*People v. Enraca*, *supra*, 53 Cal.4th at p. 761; *People v. Eulian*,

*supra*, 247 Cal.App.4th at p. 1333.) It held that CALCRIM No. 3472 "is generally a correct statement of law, which might require modification in the rare case in which a defendant intended to provoke only a nondeadly confrontation and the victim responds with deadly force." (*Eulian,* at p. 1334.) "Thus, a victim may respond to an attacker's initial physical assault with a physical counterassault, and an attacker who provoked the fight may not in asserting he was injured in the fray claim self-defense against the victim's lawful resistance." (*Ramirez, supra,* 233 Cal.App.4th at p. 947.)

The record contains evidence that Warda initiated the physical contact in the fight by stopping his car to get out and punch Hinchman in the face, while being armed with a handgun. Although Warda argues Hinchman and Woodward provoked him, the record shows they were standing outside of Warda's car as he was backing out to leave. Warda could have left but chose to stop his car and get out of his car to confront them. Hinchman and Woodward approached Warda when he stopped his car, but it was Warda who initiated the physical contact by throwing the first punch. Thus, there is evidence that Warda was the one who provoked the physical fight which would prevent him from "asserting he was injured in the fray" and "claim self-defense against the victim's lawful resistance." (*Ramirez*, *supra*, 233 Cal.App.4th at p. 947.) We conclude there was substantial evidence to support the jury instruction. (See *Young, supra,* 34 Cal.4th at p. 1200.)

The present case is readily distinguished from *People v. Olguin* (1994) 31 Cal.App.4th 1355 (*Olguin*). *Olguin* involved what started as a verbal confrontation between members of rival gangs concerning who controlled a street. The defendant fatally shot a member of a rival gang as that person began walking toward a group of people that included the defendant. The defendant said he took out his gun because he thought the people moving toward him were armed. (*Id*. at pp. 1366–1367.) The trial court instructed the jury with CALJIC No. 5.55, which described the contrived self-

52.

defense doctrine. (*Olguin,* at p. 1381, fn. 10.) Counsel were asked if they had any objection to this instruction and said they did not. (*Id.* at p. 1381.)

On appeal, it was undisputed that the record contained no facts supporting the instruction. (*Olguin*, *supra*, 31 Cal.App.4th at p. 1381.) However, it concluded the error was harmless where there was no objection, the instruction was part of several self-defense instructions, and where the jury was specifically instructed to " '[d]isregard any instruction which applies to facts determined by you not to exist.' " (*Ibid.*) The facts here are distinguished from the *Olgiun* court. Here, as discussed, substantial evidence supports the instruction. Therefore, it was not error for the court to instruct on contrived self-defense, nor was it prejudicial error for the prosecutor to factor it into her closing arguments.

We reject Warda's claim that CALCRIM No. 3472 erroneously required the jury to conclude that in contriving to use force, Warda forfeited any right to self-defense. Warda cites to *Ramirez*, which found that the instructions and the prosecutor's argument established as a matter of law that defendants were not entitled to imperfect self-defense if they contrived to use any force, even nondeadly force. (*Ramirez*, *supra*, 233 Cal.App.4th at p. 953.) The trial court in *Ramirez* had modified the standard imperfect self-defense claim under CALCRIM No. 571, stating that " 'a defendant who, through his own wrongful conduct … has created circumstances under which his adversary's attack or pursuit is legally justified.' " (*Ramirez*, at p. 952.) The court found that the modified self-defense instruction with CALCRIM No. 3472 purported to bar a defendant's claim of self-defense if he or she contrived to use force and misled the jury on the law of self-defense. (*Ibid.*) Here, the self-defense instruction was not modified in such a way and thus the same concern does not apply here.

Therefore, we conclude CALCRIM No. 3472 is a correct statement of law and applicable to the facts of the case. Accordingly, Warda forfeits this claim since he failed to object in the trial court. (See *People v. Hudson*, *supra*, 38 Cal.4th at pp. 1011–1012

53.

[by failing to object, a party forfeits any challenge to a jury instruction that was correct in law and responsive to the evidence].)

V.     THERE IS NO CUMULATIVE ERROR

Warda claims that the cumulative effect of the prosecutor's misstatements of evidence to support an erroneous theory that Warda was the initial aggressor who engaged in mutual combat, combined with the court's erroneous instructions, limited his theory of self-defense, violated his Sixth and Fourteenth Amendment rights to due process of law and a fair trial. "Cumulative error is present when the combined effect of the trial court's errors is prejudicial or harmful to the defendant. [Citations.] Although a defendant is entitled to a fair trial, he or she is not entitled to 'a perfect one.' " (*People v. Capers* (2019) 7 Cal.5th 989, 1017.) For cumulative error to mandate reversal, it must be shown to have violated the defendant's fundamental right to a fair trial. (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436.)

Based on our discussions above finding either no error or any error harmless, we do not find the presence of combined errors that are prejudicial or harmful to Warda. Nor are there cumulative errors that violate Warda's right to a fair trial.

**DISPOSITION**

We affirm the judgment.

FRANSON, J.

WE CONCUR:

DETJEN, Acting P. J.

PEÑA, J.

54.